SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellant,

v.

CONTINENTAL COMMODITIES COR-
PORATION et al., Defendants-
Appellees.

No. 73–2429.

United States Court of Appeals,
Fifth Circuit.

July 17, 1974.

Wayne M. Whitaker, Robert F. Watson, S. E. C., Ft. Worth, Tex., Thomas Taylor, Richard E. Nathan, Gen. Counsel, S. E. C., Washington, D. C., for plaintiff-appellant.

Sam N. Vilches, Jr., Fletcher Yarbrough, Martin Frost, Temporary Receivers, Dallas, Tex., for defendants-appellees.

Before RIVES, GEWIN and RONEY, Circuit Judges.

GEWIN, Circuit Judge:

This appeal is taken from a district court order denying a preliminary injunction sought by the Securities and Exchange Commission (SEC) against Continental Commodities Corporation (Continental Commodities), Charles Long, and Continental Commodities Trading Company.[1] The complaint filed by the SEC sought to enjoin Continental Commodities from committing alleged violations of various registration provisions of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a) (1970),[2] and of the anti-fraud provisions

---

1. To facilitate ease of understanding, the defendants-appellees shall be referred to collectively as Continental Commodities, except as to those transactions where the retention of their separate identities is of significance to this inquiry.

2. The relevant portions of 15 U.S.C. § 77e (1970) provide:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

\* \* \* \* \*

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration state-

of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b) (1970) and Rule 10b–5 thereunder, 17 CFR § 240.10b–5 (1973),[3] and petitioned for the appointment of a receiver of all assets and property belonging to or in its possession. The district court deemed jurisdiction of the subject matter to be lacking, reasoning that none of the transactions engaged in by Continental Commodities involved a security within the meaning of the two aforementioned Acts. In view of our disagreement with this conclusion, we reverse and remand for consideration by the district court of the propriety of granting the relief requested by the SEC.[4]

I

According to the verified complaint, Continental Commodities, a Texas corporation incorporated in November of 1972, Charles Long, its President, and Continental Commodities Trading Company, a partnership formed in California by Long in mid-January 1973, offered to sell and sold to public investors interests denominated options on commodities futures contracts.[5] Headquartered at a Los Angeles office in which all options were written, the trading enterprise was a member firm of the West Coast Commodity Exchange and hence subject to rulings of the California Commissioner of Corporations. On February 22, 1973, the Commissioner issued notice that the West Coast Commodities Exchange had classified all commodity options as securities and suspended trading in these options pending their registration as such. Compliance with this ruling dictated that Continental Commodities and Continental Commodities Trading Company cancel each option that they had underwritten and take steps to mollify their disappointed customers. Since from its inception until February 22, 1973, the Dallas office had attracted approximately 80 customers with 40 open

ment) any public proceeding or examination under section 77h of this title."
15 U.S.C. § 77q (1970) provides that:
"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

3.  15 U.S.C. § 78j (1970):
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."
17 C.F.R. § 240.10b–5 states that:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

4.  We intimate no view as to whether the SEC would be entitled to the issuance of the preliminary injunction under the standards announced in Canal Authority of the State of Florida v. Callaway, 489 F.2d 567 (5th Cir. 1974).

5.  The subject matter of the options on commodities futures contracts was varied, extending to silver, sugar, coffee, platinum, plywood and cocoa.

accounts and the Los Angeles office had attracted approximately 40 customers with 20 open accounts, the appeasement efforts required of Continental Commodities were substantial. The failure of these efforts left disgruntled customers whose affidavits appear in the abbreviated record.

The complaint filed by the SEC asserted that jurisdiction could be grounded upon one of two bases. The first base was the trading enterprise itself, the second, promissory notes issued as partial reimbursement to customers who held open accounts with Continental Commodities at the time trading was suspended.

The trading enterprise extended the opportunity to invest in commodities futures contracts. Continental Commodities undertook to recommend certain commodities futures contracts to its customers. An interested customer would first be issued an option, guaranteeing him the right to purchase the contract at a stated price, with the option to remain open for a specified period of time. Continental Commodities neither owned the underlying futures contract nor escrowed any portion of the customer payments for the purpose of acquiring such contracts. In addition, Continental Commodities undertook to advise a customer of the most opportune moment either to sell or to exercise the option. Finally, it also offered investment counseling as to the most propitious time to sell a specific futures contract.

The complaint alleged that several fraudulent acts were committed in connection with the discretionary trading accounts and particular options on futures contracts. Among these were that Continental Commodities misrepresented the lucrativeness of trading in commodities futures and the amount of reserve it had on deposit in a bank to cover for the money invested in such futures, and in specific instances of counseling as to when to exercise options, that it misrepresented the then current market price of the underlying commodity futures contract.[6]

The second potential base for finding subject matter jurisdiction was that, upon receiving notification that trading on options was suspended, Continental Commodities issued promissory notes to some of its customers as partial reimbursement. Although the record is somewhat obscure as to the precise number of recipients and the maturity date of the notes, it would appear that the notes were ostensibly non-interest bearing, with a maturity date of less than 9 months, and were issued to more than a nominal number of customers.

The complaint, as amplified by verified affidavits before the district court, alleges that the notes represented 40% of the amount of money owed to a customer, and that before issuing them, Continental Commodities exacted a promise of forbearance from legal action if payments were made as promised. Charles Long is alleged to have informed customers that the SEC had frozen his accounts, valued at $3,000,000 and thereby precluded him from paying off the debts owed by Continental Commodities, and to have indicated that the SEC would permit the company to remain in business if it would return 60% of the investors' original investments immediately and give promissory notes for the balance. Moreover, the record contains a letter written by Charles Long to a customer expressing Long's hope that Continental Commodities would square its accounts, register its options, and resume trading again. This letter tends to belie Long's testimony that there was "no way" Continental Commodities could stay in business, and is buttressed by an affidavit submitted by an SEC attorney to the effect that

---

6. Additional alleged misrepresentations concerned the qualifications and experience of the management of the issuer, the existence of SEC approval of the issuer's method of operation, the nonadverseness of financial interests of the issuer and the investor, the likelihood of increase in the market value of the securities being issued, and the use of proceeds received from purchasers of the issuer's securities.

Long had issued the notes in order to leave himself with enough cash to sue the West Coast Commodities Exchange and possibly register options should it become necessary.

Having recounted the facts which spawned this litigation and which were before the district court in its ruling on the SEC's motion for a preliminary injunction, it is critical to take cognizance of the procedural labyrinth traversed by the parties below and on appeal. As we noted earlier, the complaint filed by the SEC posited two theoretical bases for subject matter jurisdiction—that both the scheme for trading on discretionary accounts and the notes issued were securities. The latter argument was somewhat ill-framed, and hence in its April 9, 1973 order denying the motion for a preliminary injunction, the district court merely addressed and rejected the SEC's contention that the scheme of trading on discretionary accounts amounted to an investment contract. Subsequently, the SEC sought a rehearing due to the failure of the court to consider the contention that the notes were securities within the definitions of the Securities Act of 1933 and the Securities Exchange Act of 1934. The district court disposed of this motion on May 3, 1973, ruling that the notes issued by Continental Commodities were not subject to the abuses sought to be curbed by the Acts and hence did not fall within their ambit.

On appeal, the SEC seeks to preserve only its contention that the notes were securities. In its brief, the SEC informs us that assuming a favorable ruling on appeal, it will move for a permanent injunction and may then resurrect the investment contract theory.[7] We are, however, reluctant to condone the use of tactical legerdemain when such is designed to bridle an appellate court in its resolution of a case. The issue of whether trading on discretionary accounts amounts to an investment contract was vigorously contested below and was addressed at some length by the district court. Its disposition rested essentially on its perception of the legal contours of the definition of investment contract, and one of the prerequisites subsumed within it—the requirement of a common enterprise. Thus, while not impervious to the hazards of deciding a case on a basis not contested on appeal, we think that this case is particularly appropriate for such an approach.[8] Accordingly, we address both the investment contract and note issues.

## II

[1] As we noted earlier, the district court rejected the SEC's contention that the trading in discretionary commodities accounts engaged in by Continental Commodities fell within the ambit of the term security,[9] as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934. The definitional sections of the two Acts, which are substantially identical, Tcherepnin v. Knight, 389 U.S. 332, 335–336, 88 S.Ct.

---

7. In its brief filed on appeal the SEC states that when it moves for a permanent injunction, it will be upon a more extensive record unless the district court should conclude on remand that its jurisdiction with respect to the notes is a sufficient predicate for granting all the requested relief.

8. That there is no jurisdictional bar to our consideration of the investment contract issue is evidenced by the Supreme Court's ruling in United States v. Philadelphia National Bank, 374 U.S. 321, 350 n. 26, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915, 937 (1963) where the Court considered whether the Bank Merger Act insulated approved mergers from attack as violative of antitrust laws, despite the abandonment of this issue on appeal. *See also* United States v. West-

ern Pacific Railroad Company, 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126, 131 (1956).

9. It is important to be mindful of the distinction between trading on discretionary accounts and the actual commodities futures contract. Courts are in general agreement that a particular commodities futures contract is not an investment contract. Berman v. Dean Witter & Co., Inc., 353 F. Supp. 669, 671 (C.D.Cal.1973); Schwartz v. Bache & Co., Inc., 340 F.Supp. 995, 998–999 (S.D.Iowa 1972); Berman v. Orimex Trading, Inc., 291 F.Supp. 701, 702 (S.D.N.Y. 1968); Sinva v. Merrill Lynch, Pierce, Fenner & Smith, 253 F.Supp. 359, 360–367 (S. D.N.Y.1966).

548, 552–553, 19 L.Ed.2d 564, 569 (1967), stipulate that the term security includes an investment contract. *See* 15 U.S.C. § 77b(1) and 15 U.S.C. § 78c(a)(10). The district court correctly concluded that SEC v. W. J. Howey Co., 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1102–1103, 90 L.Ed. 1244, 1249 (1946) expresses the controlling standard for determining whether an investment contract exists. There, the Court stated that:

> "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. . . ."

As was noted in SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, p. 477 (5th Cir. 1974) [No. 73–2339], this test subsumes within it three elements: first the existence of an investment of money; second, that the scheme functions as a common enterprise; and third, that profits of the enterprise are derived solely from the efforts of others. It was the asserted absence of the second element that prompted the district court to hold that an investment contract did not exist.[10]

Following the Seventh Circuit's reasoning in Milnarik v. M–S Commodities, 457 F.2d 274 (7th Cir.), cert. denied, 409 U.S. 887, 93 S.Ct. 113, 34 L. Ed.2d 144 (1972), and that contained in Wasnowic v. Chicago Bd. of Trade, 352 F.Supp. 1066 (M.D.Pa.1972), aff'd without opinion, 491 F.2d 752 (3d Cir.), cert. denied, —— U.S. ——, 94 S.Ct. 2407, 40 L.Ed.2d 773 (1974),[11] the district court deemed the requisite commonality absent for two reasons: first, because

each individual invested in different options, the accounts of individual investors were unrelated; and second, there was no understanding or expectation that investors would share in a common fund comprised of the returns on their investments. These reasons constituted the very impediments to a finding of commonality in *Milnarik*. There, as here, M–S Commodities held numerous discretionary accounts for trading in commodities futures. In holding that no investment contract was presented the Seventh Circuit stated:

> "Although the complaint does allege that Nelson entered into similar discretionary arrangements with other customers, the success or failure of those other contracts had no direct impact on the profitability of plaintiff's contract. Nelson's [an agent of M–S Commodities] various customers were represented by a common agent, but they were not joint participants in the same investment enterprise."

457 F.2d at 276–277. Were this view compatible with pronouncements of the Supreme Court and this Circuit, then the district court's reasoning would be compelling. However, we cannot accept the *Milnarik* view.

In SEC v. Koscot Interplanetary, Inc., *supra*, this court decried a litmus application of the *Howey* test and expressed its preference for a resilient standard which would comport with the uniformly acclaimed remedial purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934. While primarily concerned with explicating the contours of the "solely from the efforts of others" element, we had occasion to consider the parameters of the common enterprise element as well. There, we endorsed the Ninth Circuit's formulation

---

10. We recognize that the district court did not have the benefit of our opinion in SEC v. Koscot Interplanetary, Inc., *supra*, in reaching its conclusion.

11. In its opinion the district court did not consider the proliferating number of cases adopting the contrary view. *See* Marshall v.

Lamson Bros. & Co., 368 F.Supp. 486, 489–490 (S.D.Iowa 1974); Johnson v. Arthur Espey, Shearson, Hammill & Co., 341 F.Supp. 764, 765 (S.D.N.Y.1972); Berman v. Orimex Trading, Inc., *supra*; Anderson v. Francis I. duPont & Co., 291 F.Supp. 705, 709 (D.Minn.1968); Maheu v. Reynolds, 282 F.Supp. 423, 426 (S.D.N.Y.1967).

that " '[a] common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties'," SEC v. Koscot Interplanetary, Inc., *supra* at 478, *quoting* SEC v. Glen W. Turner Enterprises, 474 F.2d 476, 482 n. 7 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), and remonstrated that "[t]he critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts." SEC v. Koscot Interplanetary, Inc., *supra* at 478.

Accordingly, although in the Koscot scheme of multi-level distributorships, wherein each investor's profit materialized only when the prospects he attracted to Opportunity Meetings and Go-Tours enlisted as distributors or sub-distributors with Koscot, this court nevertheless deemed the requisite commonality to be present:

> "[T]he fact that an investor's return is independent of that of other investors in the scheme is not decisive. Rather, the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the Koscot prospects and consummating a sale."

SEC v. Koscot Interplanetary, Inc., *supra* at 479. This language expressly rejects the proposition that the pro-rata sharing of profits is critical to a finding of commonality, *accord*, Blackwell v. Bentsen, 203 F.2d 690, 691–692 (5th Cir. 1953), cert. dismissed, 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1954); SEC v. Glen W. Turner, Inc., *supra* at 482; Marshall v. Lamson Bros. & Co., 368 F. Supp. 486, 489 (S.D.Iowa 1974); Maheu v. Reynolds & Co., 282 F.Supp. 423, 429

(S.D.N.Y.1967),[12] and casts aspersions on the elevation of a pooling ingredient to exalted status in inquiries concerning a common enterprise. For clearly, in the Koscot scheme, the independence of investor return followed from the independence of each investor's nominal effort in contributing to the materialization of a return. Thus, we cannot accept the district court's view that Continental Commodities did not function as a common enterprise because it invested in different options on commodities futures for some investors than it did for others. Were congruity of investment a prerequisite, then unlike the Koscot scheme, an enterprise would invariably either operate by pooling of investments or remunerate its customers by pro-rata sharing of profits.

Rather, as in SEC v. Koscot Interplanetary, Inc., *supra,* the critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise. Continental Commodities renders investment counseling concerning which option on commodities futures to invest in, when to sell or exercise the option, and if the option is exercised, when to sell the specific futures contract. Lacking the business acumen possessed by promoters, investors inexorably rely on Continental Commodities' guidance for the success of their investment. This guidance, like the efficacy of Koscot meetings and guidelines on recruiting prospects and consummating a sale, is uniformly extended to all its investors. That it may bear more productive fruits in the case of some options than it does in cases of others should not vitiate the essential fact that the success of the trading enterprise as a whole and cus-

---

12. Commentators are in general agreement that promoter dominance of the enterprise provides sufficient commonality and hence that pro-rata distribution of all profits is not required. *See* I. L. Loss, Securities Regulation 489 (2d Ed.1961); Coleman, A Franchise Agreement: Not A "Security" Under the Securities Act of 1933, 22 Bus. Law 493, 502–09 (1967); Borton & Abrahams, Options on Commodity Futures Contracts as Securities in California, 29 Bus. Law 867, 872 (1974); Note, Securities Regulation of Pyramid Schemes, 51 Tex.L.Rev. 788, 793 (1973); Note, Pyramid Schemes: Dare to Be Regulated, 61 Geo.L.J. 1257, 1277 (1973); *cf.* Comment, Pyramid Marketing Plant & Consumer Protection: State & Federal Regulation, 21 J. of Public Law 445, 470 (1972).

tomer investments individually is contingent upon the sagacious investment counseling of Continental Commodities. This conclusion comports with the resilient approach this court adopted to the "solely from the efforts of others" element in SEC v. Koscot Interplanetary, Inc. and the similar approach to the common enterprise element which that decision presaged.

### III

The second question for consideration is whether the notes issued by Continental Commodities in partial reimbursement to its customers upon the suspension of trading in unregistered commodities futures options are embraced by the Securities Act of 1933 and the Securities Exchange Act of 1934 and hence constitute an alternative basis of subject matter jurisdiction. Section 77b(1) of the '33 Act stipulates that unless the context otherwise requires, "the term 'security' means any note. . . ." Section 77c(a) exempts from the '33 Act's registration provisions, at issue in the charges under 15 U.S.C. § 77e(a) & (c):

> "(3) Any note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

The definitional section of the term security in the 1934 Act, 15 U.S.C. § 78c(a) states that unless the context otherwise requires,

> "(10) The term 'security' means any note . . . but shall not include . . . any note . . . which has a maturity at the time of issuance

of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

The record indicates that some of the notes issued by Continental Commodities were to mature in less than nine months. Hence we must determine initially whether the reimbursement notes issued by Continental Commodities are the type of notes sought to be regulated by the Acts and whether their maturity dates bring them within the registration exemption in the '33 Act and within the definitional exemption of the '34 Act.

We must also consider whether the transactions in which these notes were issued satisfy the additional jurisdictional prerequisites of the Acts.[13] Sanctions under the '33 Act are triggered by a sale or offer to sell a security. See 15 U.S.C. §§ 77e(a) and (c) and 77q(a). The '33 Act defines the terms sale or sell to "include every contract of sale or disposition of a security or interest in a security, for value." See 15 U.S.C. § 77b(3). Under the '34 Act, and section 10(b), the SEC must establish not only that the notes were the subject of a sale, defined by 15 U.S.C. § 78c(a)(14) to "include any contract to sell or otherwise dispose of," but also that Continental Commodities engaged in fraud "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). We address these issues seriatim.

### A. Notes as Securities

As the foregoing discussion indicates, the treatment extended to notes under the two Acts, while not precisely the same, is virtually identical. See Bellah v. First National Bank of Hereford, 495 F.2d 1109, 1112 (5th Cir. 1974); Zeller v. Bogue Electric Manufacturing Corp., 476 F.2d 795, 799–800 (2d Cir. 1973); Anderson v. Francis I. duPont &

---

13. At oral argument, counsel for Continental Commodities virtually withdrew the contention that the SEC had failed to prove that the issuance of notes was facilitated by use of any means or instruments of transportation or communication in interstate commerce. Accordingly, we do not consider this question.

Co., 291 F.Supp. 705, 708 (D.Minn. 1968). The following analysis proceeds from this discernible similitude of the Acts.

Taking their cue from the Supreme Court's pronouncement that " '[i]nstruments may be included within any of [The Acts'] definitions, as a matter of law, if on their face they answer to the name or description,' " Tcherepnin v. Knight, 389 U.S. 332, 339, 88 S.Ct. 548, 555, 19 L.Ed.2d 564, 571 (1967), *quoting* SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 351, 64 S. Ct. 120, 123, 88 L.Ed. 88, 93 (1943), most courts have countenanced a literal reading of the definition of security to the extent that almost all notes are held to be securities. *See* Rekant v. Desser, 425 F.2d 872, 878 (5th Cir. 1970); Lehigh Valley Trust Co. v. Central National Bank of Jacksonville, 409 F.2d 989, 991–992 (5th Cir. 1969); Joseph v. Norman's Health Club, 336 F.Supp. 307, 313 (E.D.Mo.1971). Such a literal reading is compatible with the acknowledged policy of strictly construing exemptions from the coverage of the Acts. *See* SEC v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494, 1499 (1953); Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680, 689 (5th Cir. 1971). However, it should not be employed to frustrate the spirit or intention of Congress in promulgating the Acts.

That the notes issued by Continental Commodities possess a maturity date of less than nine months is not dispositive. This court intimated as much in United States v. Rachal, 473 F.2d 1338 (5th Cir. 1973), where in a case involving the exemption from registration for short-term notes, we approved the following instruction given by the trial court:

"This exemption was intended by Congress to cover that type of commercial paper available for discount at a Federal Reserve Bank, not generally sold to the public or advertised for public sale. It applies only to such notes, usually high quality *commercial paper*, as arise out of current transactions and are hence covered by assets readily convertible into cash. The exemption does not apply to common capital stock or an instrument which has the characteristics of such stock generally, regardless of what other characteristics it may have." (emphasis added)

473 F.2d at 1343. Underlying our approval was the premise that the Acts' exemptions for notes extend only to commercial paper, not investment paper. This premise has received increasing acceptance, as indicated by the number of cases rejecting the proposition that notes of less than 9 months maturity are per se exempt from the registration provisions of the '33 Act and the definitional section of security appearing in the '34 Act. *See* Zeller v. Bogue Electric Manufacturing Corp., *supra* at 800; Sanders v. John Nuveen and Co., Inc., 463 F.2d 1075, 1080 (7th Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L. Ed.2d 302 (1972); SEC v. Vanco, Inc., 283 F.2d 304 (3d Cir. 1960), aff'g, 166 F.Supp. 422, 423 (D.N.J.1958); United States v. Hill, 298 F.Supp. 1221, 1226–1227 (D.Conn.1969); Anderson v. Francis I. duPont & Co., *supra* at 708–709. Additional testimony to its approval is supplied by courts which deem the commercial-investment dichotomy as implicit within the "unless the context otherwise requires" prefatory language of 15 U.S.C. §§ 77b(1) and 78c(a)(10), *see* Lino v. City Investing Co., 487 F.2d 689, 694–695 (3d Cir. 1973); Joseph v. Norman's Health Club, Inc., *supra* at 313, and those courts which read the dichotomy into the definitional sections without positing a precise derivational source. *See* Davis v. Avco Corp., 371 F.Supp. 782, 787 (N.D.Ohio 1974); SEC v. Thunderbird Valley, Inc., 356 F.Supp. 184, 188 (D.S.D.1973); McClure v. First National Bank of Lubbock, Texas, 352 F.Supp. 454, 457–458 (N.D.Tex. 1973). And it was this impressive line of cases which led this court to hold that the exemption for short-term notes under the Securities Exchange Act of 1934 applied only to commercial and not investment paper in Bellah v. First National Bank of Hereford, *supra*. Ac-

cordingly, it is the character of the note, not its maturity date, which determines coverage under both the registration provisions of the Securities Act of 1933, and the Securities Exchange Act of 1934.

The above quoted instruction approved in United States v. Rachal, *supra*, largely reflects the SEC's position concerning the exemption from the '33 Act's registration provisions. Securities Act.Rel. No.4412, 26 Fed.Reg. at 9159.[14] This release, instructive as to the '34 Act's definition of a note, *see* Bellah v. First National Bank of Hereford, *supra* at 1112 n. 3; Zeller v. Bogue Electric Manufacturing Corp., *supra* at 800, sets forth four factors which underscore the commercial-investment dichotomy of notes. These factors are that the notes are (1) of prime quality; (2) used to finance current transactions; (3) not offered to the public; and (4) discountable at a Federal Reserve Bank. While the precise meaning of these criteria has not been extensively addressed by the courts, *see* Comment, The Commercial Paper Market & The Securities Acts, 39 U. of Chicago L.Rev. 362, 381 (1972), it would appear that notes issued by a company or individual in precarious financial straits are not either prime quality, issued to facilitate current transactions,

or eligible for discounting by Federal Reserve Banks. *See* Sanders v. John Nuveen & Co., Inc., *supra* at 1079; United States v. Hill, *supra* at 1227. Continental Commodities' impecunious condition, as witnessed by the fact that its customers were left unsatisfied by the issuance of the notes, would thus dispel the suggestion that the notes it issued fall within the four criteria and hence the characterization of commercial paper which the criteria adumbrate.[15]

Although the SEC release is entitled to great weight, it is not dispositive, *see* SEC v. Koscot Interplanetary, *supra* at 483 n. 14; Zeller v. Bogue Electric Manufacturing Corp., *supra* at 800, and hence the conclusion that the term "security" embraces the Continental Commodities notes need not rest on an application of the factors contained in the SEC release alone. Rather, it is appropriate and preferable to consider and apply the judicially assessed characteristics ascribed to commercial and investment paper.

The paramount concern in this inquiry is upon the nature of the transaction in which the note is issued. In Lino v. City Investing Co., *supra*, the Third Circuit dismissed on jurisdictional grounds a suit brought under various registration and anti-fraud provisions of

14. The release provides as follows:
    "The legislative history of the Act makes clear that section 3(a)(3) applies only to prime quality negotiable paper of a type nor ordinarily purchased by the general public, that is, paper used to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks."
    This position tracks in part the description of exempted notes appearing in H.R.Rep. No.85, 73d Cong., 1st Sess. 15 (1933). The release, and its support in the legislative history of the Acts is discussed extensively in Comment, The Commercial Paper Market and the Securities Acts, 39 U. of Chicago L. Rev., 362, 380–396 (1972).

15. At oral argument, counsel for Continental Commodities conceded that the notes were not of prime quality or capable of discounting at a Federal Reserve Bank. That the

legislative history reflects that discountable paper was conceived of as paper with "a record of safety second only to Government bonds" *see* Hearings on S. 875 Before the Senate Comm. on Banking & Currency, 73rd Cong., 1st Sess. at 94, 95 (1933) would support the conclusion that the notes were not possessed of the requisite financial inviolability.
    Our conclusion on this score should not be read to undermine the observation in Bellah v. First National Bank of Hereford, *supra*, that under the release criteria, that Bellah's lack of financial viability cannot metamorphize commercial paper into investment paper. This observation was confined to circumstances where the impecunious maker seeks to invoke the protections of the Act. Bellah v. First National Bank of Hereford, *supra* at 1112 n. 3. Accordingly, it is inapposite where, as here, the maker seeks to avoid the Act's sanctions.

the Acts by a purchaser of a franchise sales center license for which promissory notes had been given to the franchisor in partial payment. After observing that there was no indication that the franchisor was soliciting venture capital, the court stated:

> "In no way could City Investing be said to have 'purchased' Lino's notes for speculation or investment. City Investing was selling a contract right to Lino, not buying his security. It simply lacks common sense to describe the transaction as City Investing purchasing John Lino's security by paying him the right to operate one of its Franchise Sales Centers."

487 F.2d at 695. Thus, the Third Circuit concluded that City Investing Company accepted the note, not to invest in Lino's franchise, but to enable the franchise to be financed.[16] *See also* SEC v. Fifth Avenue Coach Lines, Inc., 289 F. Supp. 3, 13, 38 (S.D.N.Y.1968), aff'd on other grounds, 435 F.2d 510 (2d Cir. 1970) (notes issued by director and officer of corporation to corporation to enable it to meet current business obligations treated as personal loans); City Nat'l Bank v. Vanderboom, 290 F.Supp. 592 (W.D.Ark.1968), aff'd, 422 F.2d 221 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970) (note issued to bank in exchange for a loan, the proceeds of which were subsequently used to purchase stock of a corporation, treated as not within the Acts); Joseph v. Norman's Health Club, Inc., *supra* (notes issued by purchasers of lifetime memberships in health clubs are commercial notes). *But see* MacAndrews & Forbes Co. v. American Barmag Corp., 339 F.Supp. 1401 (D.S.C.1972) (bills of exchange issued by purchaser of machines held to be securities). In this sense, City Investing Company extended financing in much the same way that a bank does in a *private* loan transaction, and in the latter situation, a note re-

ceived by the bank does not easily lend itself to characterization as investment paper. *See* Sanders v. John Nuveen & Co., *supra* at 1080 (dicta); McClure v. First National Bank of Lubbock, *supra*. Such was the import of our decision in Bellah v. First National Bank of Hereford, *supra*, where we held that loans extended by a bank to enable the Bellahs to finance a livestock business were private in nature, and hence that a note issued to the bank in exchange was commercial and not investment paper. In *Bellah*, there was no evidence in the record to suggest that the bank proffered the loan in hopes of realizing a return commensurate with the success of the Bellah's livestock enterprise.

Illustrative of the transactions in which a note is deemed to be investment paper is Zeller v. Bogue Electric Manufacturing Corp., *supra*. Zeller, a shareholder in Belco Pollution Control Corp. (Belco), brought a derivative action against Bogue Electric Manufacturing Corp. (Bogue) its parent corporation, alleging as grounds therefor that Bogue had caused Belco to loan money to Bogue on terms that were purportedly unfair. The individual protagonists, directors and accountants of both parent and subsidiary, had caused Belco to make a series of open account loans to Bogue for which no interest was required to be paid. Over a year later, the open account indebtedness was supplanted by a demand interest bearing note, collateralized by shares of Belco stock owned by Bogue. While the opinion of the Second Circuit does not reveal the reason why the note was issued at this time, it does indicate that the initial loan was prompted by operating losses suffered by Bogue. Thus, the loan constituted an attempt to return Bogue to a position of financial viability. And to the extent that this restoration of Bogue would rebound to Belco's benefit, Belco's supplying of money on open account con-

---

16. In view of the SEC's disapprobation of this decision, we intimate no view as to its propriety. The SEC maintained that the Third Circuit overlooked the fact that the franchisor was seeking venture capital.

stituted not a private commercial loan but an investment. Accordingly the court held that since the note if issued at the time of the initial loan would have been a security, it was also a security even though its issuance was delayed. *See* 476 F.2d at 800.

The analogies between *Zeller* and the instant case compel us to conclude that the notes issued by Continental Commodities were investment and not commercial in nature. Despite unrelenting arguments by Continental Commodities to the contrary, it is apparent from a review of the record that the notes were issued to rejuvenate and not to liquidate the enterprise. Affiants Thomas M. Cain, Jr. and Bob Doss claimed that they had been apprised by Charles Long that upon reimbursement of its customers in part with cash and in part with the notes, Continental Commodities would be permitted to remain in business by the SEC. Similarly, the record contains a letter written to customer Milton Young in which Long states: "We hope that in a short period of time we are able to register our options as securities and begin selling options again." Finally, affiant Wayne M. Whitaker, a staff attorney with the Fort Worth Regional Office of the SEC, related the substance of Long's explanation for the payment scheme in an interview as follows: "Long stated that he does have funds to pay in full the customer's original investments, but that he is only offering a 60% immediate refund and a note for the remaining 40% to certain large customers in order to leave him with enough cash to sue the West Coast Commodity Exchange and possibly register the options should it become necessary." To the extent that the district court's disposition may have rested on the finding that the notes issued by

Continental Commodities were designed to liquidate the enterprise, the aforementioned evidence establishes and we conclude that this finding was clearly erroneous.[17]

Once the resuscitative nature of the notes is established, the conclusion is ineluctable that the notes were investment and not commercial paper. Since revival would inure to their benefit, recipients accepted the notes with the hope of realizing a greater return on their investments. To this extent the recipients here were in a position akin to that of the Belco shareholders in Zeller v. Bogue Electric Manufacturing Corp., *supra*.

### B. *Additional Jurisdictional Prerequisites*

The final question for review is whether for purposes of the '33 Act, Continental Commodities' issuance of the notes constituted a sale or disposition of a security for value and whether for purposes of the '34 Act, the notes were sold and whether there was any fraud in connection with the sale of such notes. We address the sale aspect under both the Acts, and then turn to the "in connection with" requirement under section 10b alone.

■ We begin by noting that the meaning of the terms "sale" and "purchase and sale" under different sections of the Acts may vary. *See* SEC v. National Securities, Inc., 393 U.S. 453, 466, 89 S.Ct. 564, 571, 21 L.Ed.2d 668, 679–680 (1968); International Controls Corp. v. Vesco, 490 F.2d 1334, 1343 n.8 (2d Cir.), cert. denied, —— U.S. ——, 94 S.Ct. 2644, 40 L.Ed.2d —— (1974). Amenability of particular securities to these terms is determined by whether the transactions in which the

---

17. As our analysis indicates, we adopt as the relevant index, not whether what was contemplated did in fact materialize, but rather what was in fact contemplated by the investor and the promoter. Here, the investor was led to expect that his acceptance of the note would help to preserve the trading en-

terprise's existence. That Continental Commodities may have been more sanguine than the facts warranted, or even misrepresented its future, cannot alter the fact that it represented that the notes would enhance the enterprise's operation.

securities are issued are subject to the abuses sought to be eliminated by the individual Acts. The purpose of the registration provisions of the '33 Act is to provide adequate disclosure to members of the investing public, e. g. SEC v. North American Research & Development Corp., 424 F.2d 63, 71 (2d Cir. 1970); SEC v. Harwyn Industries Corp., 326 F.Supp. 943, 954 (S.D.N.Y. 1971), and that of the section 10(b), to protect investors from the use of manipulative or deceptive devices in securities transactions. *See* Sargent v. Genesco, Inc., 492 F.2d 750, 760 (5th Cir. 1974); Smallwood v. Pearl Brewing Company, 489 F.2d 579, 590 (5th Cir. 1974). Under both Acts, the definitions of the term sale are broad. *Compare, e. g.,* Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128, 134 (1971) *and* International Controls Corp. v. Vesco, *supra* at 1343 *with e. g.,* Collins v. Rukin, 342 F.Supp. 1282, 1288 (D.Mass.1972).

Continental Commodities claims that the issuance of the notes did not constitute a sale under either Act essentially because it did not receive any value from the recipients. But an examination of the record reveals that an agreement to forbear bringing legal action was a condition exacted by Continental Commodities for the issuance of the notes. The text of a telegram from customer Gerald Rubman to Charles Long is illustrative: "Gentlemen it is understood that as a condition of withholding legal action, I am to receive within seven days a check for sixty percent of my deposit together with a promissory note for the balance of funds due and payable me [sic]." And as the affidavits alluded to above indicate, Continental Commodities represented that by issuing the

notes, it bought not only SEC permission to continue operating, but also time within which it could sue the West Coast Commodities Exchange, seeking a reversal of its prohibition against trading on unregistered commodities options.

The question of whether in these circumstances a sale was effected under the relevant portions of the Acts is one yet to be addressed by the courts. An affirmative response seems to be suggested by two vintage cases involving suits for unlawful insider trading where courts held sales to have been effected where securities were issued in payment for past debts. *See* Blau v. Albert, 157 F.Supp. 816, 820 (S.D.N.Y.1957); Smolowe v. Delendo Corp., 46 F.Supp. 758, 763 (S.D.N.Y.1942), aff'd, 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). Moreover, in Zeller v. Bogue Electric Manufacturing Corp., *supra*, the Second Circuit apparently did not deem the absence of tangible consideration flowing from Belco to Bogue concomitant with the issuance of the note to be an impediment to jurisdiction. This conclusion can be supported under the reasoning that the initial open account loans extended by Belco constituted the requisite return to Bogue for the note it subsequently issued—reasoning equally appropriate here.[18]

We would also note that Continental Commodities most assuredly would be deemed to have engaged in a sale had it issued promissory notes not to its customers but to other members of the investing public and applied the proceeds to its customer indebtedness. The net effect of this hypothetical transaction and the instant transaction is the same —time is bought hopefully to enable the enterprise to revive itself. The potential jeopardy to the salutary purposes of

---

18. Under the *Zeller* reasoning, payment by customers at the time they opened accounts, with Continental Commodities would constitute value. Our appraisal of the note issuance as a resuscitating and not liquidating transaction obviates any need to decide whether it is proper to consider the notes as a segment of one continuous transaction, the inception of which was at the time the trading accounts were opened. The *Zeller* disposition appears to tacitly endorse such a consideration.

the registration and anti-fraud provisions by a conclusion that a sale did not take place in either transaction is the same. To hold that the instant facts did not constitute a sale would thus be tantamount to condoning the view that one can not circumvent these provisions of the Acts directly but can do so indirectly.

 We also hold that for jurisdictional purposes, the requisite fraud in connection with the sale or purchase of a security has been alleged. The complaint charges that Continental Commodities made several fraudulent representations at the time the notes were issued, *inter alia,* that the SEC had frozen $3,000,000 of Continental Commodities money and had approved its remuneration plan. It also charges that Continental Commodities misrepresented the amount of money it had on reserve to back investments at the time customers initially invested in commodities options. This latter alleged misstatement can be considered as having a continuing effect up to and beyond the time the notes were issued. Accordingly these purported misrepresentations fall clearly within the "in connection with" requirement, as adumbrated in Superintendent of Insurance v. Bankers Life & Casualty Co., *supra,* Sargent v. Genesco, Inc., *supra,* and Smallwood v. Pearl Brewing Co., *supra.*[19]

### IV

To reiterate, we hold only that the record before the district court on the SEC's motion for a preliminary injunction was sufficient to establish jurisdiction under the Securities Act of 1933 and the Securities Exchange Act of 1934. We intimate no view as to the verity of the SEC's assertions of fraud or the wisdom of issuing a preliminary

injunction. Accordingly, this cause is reversed and remanded with instructions to consider the propriety of granting a preliminary injunction and other appropriate relief.

Reversed and remanded.

---

19. In Sargent v. Genesco, *supra* at 763, this court construed *Banker's Life* to establish that:

"[T]he defendant's fraudulent conduct need not specifically relate to the plaintiff's securities as in a misrepresentation involving the value of securities purchased or sold by the plaintiff. Instead, the requisite nexus exists if such conduct merely touches upon the plaintiff's purchase or sale."