AMERICAN GRAIN ASSOCIATION

v.

CANFIELD, BURCH & MANCUSO; Frank D. Burch; William A. Mancuso; Richard W. Johnson; and James C. Williams.

Civ. A. No. 790391.

United States District Court, W. D. Louisiana, Lake Charles Division.

Feb. 1, 1982.

Edwin G. Preis, Jr., Vance R. Andrus, Andrus & Preis, Lafayette, La., Phillip W. Preis, Preis, Crawford, Scheffy & Mauldin, Baton Rouge, La., for plaintiff.

Homer C. Singleton, Jr., Baggett, McCall, Singleton, Ranier & Ieyoub, Lake Charles, La., for James C. Williams.

W. Gregory Arnette, Jr., Arnette & Riley, Ltd., Jennings, La., for Richard W. Johnson.

James R. Nieset, Plauche, Smith, Hebert & Nieset, Lake Charles, La., for Canfield, Burch & Mancuso, Frank D. Burch and William A. Mancuso.

## MEMORANDUM RULING

VERON, District Judge.

This action was brought by the plaintiff, American Grain Association (hereinafter AGA), pursuant to Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C.A. 78j(b)), Rule 10(6)–5 (17 C.F.R. 240.10(b)–5), the Commodities Exchange Act (7 C.F.R. § 6b), and the principles of Louisiana Law. In answering the suit, defendants asserted that this court lacked jurisdiction over the subject matter of plaintiff's complaint and that plaintiff had failed to state a claim upon which relief could be granted. All parties then filed motions for summary judgment. In support of their motions for summary judgment, defendants asserted that plaintiff had failed to establish the existence of a security and therefore failed to state a claim cognizable under the federal securities acts.

The court thereafter requested argument on whether or not a security was involved in this case. In addition, the court requested the parties to address the effect of the 1974 amendments to the Commodity Exchange Act on Section 10(b) of the Securities Exchange Act of 1934.

Having had the benefit of oral argument and reviewed the memoranda submitted by the parties, the court is now ready to rule.

## I. INTRODUCTION

In order to sufficiently treat the issues before the court, it is important to be aware, in some detail, of the historical and factual background associated with this litigation.

Plaintiff, AGA, came into existence back in 1966 as a grain cooperative marketing venture primarily dealing with soybeans. The rationale for its creation was that a cooperative association of farmers, pooling their physical beans, would have more economic power to obtain favorable crop sales. It was expected that storage facilities could be utilized more effectively by a group and that group marketing techniques would result in higher prices to the farmers.

By taking advantage of the economic power associated with a large membership, the cooperative could arrange for bulk sales to be held at specific locations and make a profit on the transportation costs. By staying abreast of market demands for physical beans, the cooperative could make sales at more than the going rate where a "spot demand" resulted in a higher price being paid.

The cooperative could also make money "on the blend." The price quoted for soybeans is the price for the best grade. That price decreases as the grade of the beans decreases. However, since each grade permits a certain percentage of lower grade beans to be present, a cooperative which has access to a large variety of grades is able to blend lower grade beans with higher grade beans in a proportion sufficient to maintain an overall higher grade. Thus, higher prices could be returned to members for lower grade beans.

The profits which the cooperative derived from such activities were returned to the members in the form of patronage dividends in accordance with membership participation.

From this relatively simple conceptional beginning, AGA progressed into a cooperative which endeavored to provide a wide range of sophisticated financial services to its members from the time of planting through the time of harvesting. As part of these services, AGA purchased soybeans from its members in a manner which made possible alternative methods of marketing.

One alternative was known as a "forward contract." A farmer utilizing this method could contract with the cooperative to deliver a definite quantity of soybeans on an agreed future date at the market place prevailing on the day the contract was entered.

Another alternative was called the "daily market." Under this procedure, a farmer could deliver his soybeans to a collection point and sell them on the spot for the daily price at that particular location.

A third alternative was called the "seasonal pool." If a farmer chose to utilize this method of marketing, he would take his crop to a collection point and designate the quantity he wished placed in the pool. For those beans allocated to this particular pool, the member farmer received a certain percentage of the price determined by the Board of Directors of the cooperative to represent a reasonable expectation of market price. These beans were then sold by AGA. The cushion of money derived from the sale (i.e., the difference between the amount actually paid to the farmer and the market price at the time the beans entered the pool) was then speculated with on the Commodities Futures Market in order to obtain the highest possible return for all farmers participating in the seasonal pool. The idea was that a marketing expert, employed by the cooperative, would use this cushion to play the market in hopes of increasing the profits of the seasonal pool participants. Because AGA employed a grain trader to play the futures market, the

individual farmers were relieved of the burden of selecting a broker, maintaining a margin account, and handling the attendant financial transactions. The profits which the cooperative derived from successful trading on the futures market were returned to the members of the seasonal pool who had permitted a portion of their crops to be used for speculation purposes in the hopes of obtaining an even higher price.

The cooperative's trading operations were, for the most part, successful. However, during the spring and summer of 1977, substantial losses were incurred by AGA. It is alleged that these losses were caused by the defendants.

Plaintiff complains that defendants Canfield, Burch & Mancuso (hereinafter CBM), a certified public accounting partnership, performed an audit of plaintiff's financial condition in which defendants erroneously overstated plaintiff's income. It is alleged that this overstatement induced plaintiff to declare bonuses and patronage dividends which rendered it bankrupt. In addition, plaintiff complains that defendant Johnson, employed by AGA since its inception as a grain trader/merchandiser to trade on the futures market, mismanaged plaintiff's grain operations by taking speculative positions on the soybean futures market. It is alleged that this unauthorized speculation was concealed from the Board of Directors of AGA and that it caused plaintiff to incur substantial losses in the grain market. Finally, plaintiff alleges that all defendants are guilty of fraud, negligence, breach of fiduciary duty and breach of contract under the laws of the state of Louisiana.

In alleging the jurisdiction of this court, plaintiff complains that the above and foregoing actions of the defendants violated Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10(b)–5 promulgated thereunder. In addition, plaintiff alleges that these actions also violated the Commodities Exchange Act (7 C.F.R. § 6b). Plaintiff seeks to recover damages on its own behalf and as a representative of all members of AGA who suffered losses as a result of defendants alleged actions.

## II. EXISTENCE OF A SECURITY

Plaintiff has alleged jurisdiction under Section 10(b) of the Securities and Exchange Act of 1934 (hereinafter Act) and Rule 10(b)–5 promulgated thereunder. Rule 10(b)–5 (17 C.F.R. 240.10b–5) provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of Interstate Commerce or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any *security*. (Emphasis added)

From this it is clear that in order to state a cause of action under Rule 10(b)–5 of the Act, the plaintiff must establish that a "security" was purchased or sold. Before either the Securities Act or the Securities Exchange Act applies, it is necessary to prove that what was sold were securities under the Act. *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

The term "security" was broadly defined in Section 2(1) of the Securities Act of 1933 as follows:

The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim

certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 15 U.S.C.A. § 77b(1).

The definition adopted by the Securities Exchange Act of 1934, 15 U.S.C.A. § 78c(a)(10), is "virtually identical" and is intended to be substantially the same. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). As is readily apparent, the definition makes no reference to commodity futures contracts, nor does it contain any term that can fairly be construed to include such contracts. *McCurnin v. Kohlmeyer and Co.*, 340 F.Supp. 1338 (E.D.La.1972).

The test to be applied in determining whether a particular instrument is in fact a security was stated by the Supreme Court to be:

> "The test . . . is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *SEC v. C.M. Joiner Leasing Corp., supra*, 320 U.S. at 352–353, 64 S.Ct. at 124.

Plaintiff has argued in this case that participation by member farmers in the seasonal pool offered by AGA constitutes participation in a discretionary commodities account which is an "investment contract" and thus a security within the meaning of Section 2(1) of the Securities Act of 1933.

The first question faced by the court is whether or not an "investment contract" (and thus a security) exists under the facts of this case. We will then decide whether a cause of action exists under Section 10(b) and Rule 10(b)–5, even if the commodity futures account is a security, in light of the exclusive jurisdiction granted to the CFTC by the 1974 amendments to the Commodity Exchange Act.

## A. INVESTMENT CONTRACT

■ The definitional test of what constitutes an "investment contract" for purposes of the Securities Act was set out in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1102–1103, 90 L.Ed. 1244 (1946) wherein the Court stated:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.

According to the Fifth Circuit, this test subsumes within it three elements: first, the existence of an investment of money; second, that the scheme functions as a common enterprise; and third, that profits of the enterprise are derived solely from the efforts of the promoter or a third party. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 477 (5th Cir. 1974).

■ The jurisprudence is clear that a particular commodities futures contract does not satisfy the *Howey* test for an investment contract and therefore cannot be a security. *Moody v. Bache & Co.*, 570 F.2d 523, 525 (5th Cir. 1978). However, the Fifth Circuit has held that discretionary accounts in commodities futures contracts may be "investment contracts" and thus securities under the Acts. This is because discretionary accounts may satisfy the *Howey* requirements of an investment of money, common enterprise, and dependence on the efforts of others. *SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974).

This case is presently before the court on defendants' motion for summary judgment on grounds that the plaintiff has not met the *Howey* test for an investment contract and therefore no security is involved. In opposition to defendants' motion, plaintiff argues that the facts in this case warrant the conclusion that the *Howey* test has been met.

### 1. Investment of Money

Defendants allege that no money was ever invested in this case; that the requirement of an investment of money must be construed literally; and that the very concept of the seasonal pool did not provide for or permit the investment of money by any shareholders.

According to the defendants, when a farmer delivered his crop to an AGA designated handling facility, he could elect to participate in the seasonal pool. If he elected to participate, the farmer would then receive a stipulated cash advance, set by AGA's Board of Directors, which represented a portion of the market price of the beans. AGA's grain trader (defendant Johnson) would then use his marketing expertise in an attempt to get the best possible price for the beans in the seasonal pool. At the end of the trading period, the difference between the price finally obtained and the cash advance made was then distributed to the members.

Defendants allege that a shareholder's participation in the seasonal pool was contingent upon his delivery of a crop to the association and that no provision was made for shareholders to buy into the pool. Thus, defendants argue, there is no investment of money as is required under the *Howey* test.

On the other hand, plaintiff alleges that its' shareholders invested certain funds in the seasonal pool and that defendant Johnson made investments in the futures market with these funds. At the very least, plaintiff alleges that by delivering beans to the seasonal pool, the shareholders of AGA, in effect, made an investment of a certain amount of their crop proceeds. This allegation presumably rests on the theory that since the farmer does not receive the full market price for his crop on entering the pool, the deferred compensation (the difference between what the farmer does receive and the actual market price) constitutes an investment of money.

■ If, as maintained by the defendants, no actual money was invested by plaintiff's shareholders, then we have no difficulty in holding that the plaintiff has not met this prong of the *Howey* test. Under such facts, the scheme utilized by the cooperative to maximize a participating farmers income could not be held to constitute one of those ·"countless and variable schemes devised by those who seek the use of the *money* of others on the promise of profits." *Howey, supra,* at 299, 66 S.Ct. at 1103 (emphasis added). However, if actual capital was invested by plaintiff's shareholders, as is alleged by the plaintiff, this part of the *Howey* test has been met.

■ For summary judgment purposes, however, the plaintiff has shown that a genuine issue of material fact exists as to whether an investment of money took place. The court notes that the burden of proof lies with the party seeking summary judgment, and therefore any doubt about the existence of a genuine issue of material fact must be resolved against the defendants. *Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410 (5th Cir. 1980). Inasmuch as the court must make a finding of fact as to whether or not the plaintiff invested money as required by *Howey,* we hold that defendants' motion should be and hereby is DENIED.

However, in the event the court is found to be in error, we will address the other requirements of the *Howey* test.

### 2. Common Enterprise

The Fifth Circuit has defined a common enterprise as "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Securities and Exchange Comm. v. Koscot Inter., Inc.,* 497 F.2d 473, 478 (5th Cir. 1974); *Securities and Exchange Comm. v. Continental Commodities Corp.,* 497 F.2d 516, 522 (5th Cir. 1974); *see also: SEC v. Glenn Turner Enterprises,* 474 F.2d 476, 482 n.7 (9th Cir. 1973). Although the language of this definition suggests a two part test, the Fifth Circuit has stated that "the critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." *Continental Commodities, supra,* at 522. Further, "the critical factor is ... the uniformity of impact of the promoter's efforts." *Koscot, supra* at 478.

In *Continental Commodities,* the defendant rendered investment counseling to public investors concerning which options on commodities futures to invest in, when to

sell or exercise the option, and if the option was exercised, when to sell the specific futures contract. Under these facts, the court held that investment success was dependent on promoter expertise and therefore a common enterprise existed.

■ Although no public investors are involved under the facts of this case, defendants do not dispute that the seasonal pool was a form of common enterprise by which the association sought to assist its members in obtaining a maximum price for their beans. Neither do the defendants dispute that the success of the seasonal pool was somewhat dependent upon the ability of plaintiff's grain trader. Thus, the court finds that investment success was dependent on promoter expertise and therefore plaintiff has satisfied the common enterprise prong of the *Howey* test.

### 3. Profits Solely From the Efforts of Others

Defendants allege that any profits derived from the operation of the seasonal pool were not derived solely from the efforts of a promoter or a third party. Defendants characterize the seasonal pool as a cooperative agricultural marketing venture which relied as much on the labor of the farmer in planting, growing, harvesting and delivering his crop as it did on the efforts of plaintiff's grain trader. According to the defendants the sale of the soybeans delivered to the seasonal pool was only the culminating step in the agricultural production process. Whatever profit was ultimately realized came not only from the expertise of the trader but from the expertise of each member farmer in producing the crop offered for sale. Defendants' argument, in short, is that without the farmer's crop there can be no seasonal pool, and therefore profits are not solely dependent upon the expertise of plaintiff's grain trader.

The test to be used in determining whether a scheme involves an expectation of profits to be derived solely from the efforts of others was announced by the Ninth Circuit in *SEC v. Glenn Turner Enterprises*, 474 F.2d 476, 482 (9th Cir. 1973) and adopted by the Fifth Circuit in *Securities and Exchange Comm. v. Koscot Inter., Inc.*, 497 F.2d 473 (5th Cir. 1974). In both these cases the court stated that the proper standard is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Glenn Turner, supra*, at 482.

Plaintiff has alleged that defendant Johnson's trading efforts were the undeniably significant ones essential to the failure or success of the seasonal pool. While we must admit that without farmer participation the seasonal pool would never have come into existence, we cannot so readily conclude that once the pool was created, Mr. Johnson was not the one expending the essential managerial efforts which affected its failure or success. He was, after all, the cooperatives grain trader whose duties included marketing and otherwise trading on behalf of the farmers.

Since the inquiry in this analysis is whether the efforts made by defendant Johnson were the undeniably significant ones on which the plaintiff relied, and since the plaintiff is AGA suing on behalf of all seasonal pool participants, we must pre-suppose the existence of the seasonal pool. Therefore, whatever efforts the farmers expended in bringing the pool into existence are immaterial. Accordingly, we find that plaintiff has met the third prong of the *Howey* test.

While refusing to hold at this time that an investment contract (and thus a security) is involved under these facts, the court believes that for purposes of summary judgment, the plaintiff has shown that he has satisfied two out of three prongs of the *Howey* test and that a genuine issue of material fact exists as to whether an investment of money ever took place. Accordingly, defendants motion is DENIED.

### B. CAUSE OF ACTION UNDER SECTION 10 OF THE SECURITIES EXCHANGE ACT

The court is now faced with deciding whether a cause of action continues to exist

for alleged violations of Section 10 of the federal securities laws in light of the 1974 amendments to the Commodity Exchange Act (CEA) which placed exclusive jurisdiction over commodities with the Commodity Futures Trading Commission (CFTC).

Congress, in the 1974 amendments to the CEA, established the CFTC and vested it with exclusive jurisdiction over "accounts, agreements ... and transactions" involving commodity futures markets. 7 U.S.C. § 2 (1974). Many district courts have held that these amendments preempt the field of commodity futures trading even where a security is found to exist and therefor bar any claim brought pursuant to the federal securities laws. *Gonzalez v. Paine, Webber*, CCH Fed.Sec.L.Rep. 97, 561 (S.D.N.Y.1980); *Fairchild, Arabatis & Smith v. Prometco, Co.*, 470 F.Supp. 610 (S.D.N.Y.1980); *Hofmayer v. Dean Witter & Co.*, 459 F.Supp. 733 (N.D.Cal.1978); *Bartels v. International Commodities Corp.*, 435 F.Supp. 865 (D.Conn.1977). *See also E. F. Hutton & Co. v. Schank*, 456 F.Supp. 507 (D. Utah 1976). Other courts have held that the grant of exclusive jurisdiction to the CFTC to regulate commodity transactions does not preempt *judicial* application of the federal securities statutes to a security used for trading commodities futures. *Mullis v. Merrill Lynch, Fenner and Smith, Inc.*, 492 F.Supp. 1345 (D.Nev.1980); *Westlake v. Abrams*, 504 F.Supp. 337 (N.D.Ga.1980). However, these courts have also held that there can be no private liability actions based on SEC rules and regulations because the CFTC is the preemptive agency. According to the *Mullis* case, the SEC has no power to regulate securities whose dominant feature is participation in trading commodity futures.

■ Since the CFTC now has exclusive jurisdiction to promulgate rules and regulations concerning commodity futures trading, Rule 10(b)–5 is inapplicable, and because Section 10 of the Exchange Act only proscribes activity which violates SEC rules and regulations, no cause of action dealing with commodity futures trading can now be brought under Section 10 of the Exchange Act. *Westlake v. Abrams, supra*, at 346.

Since the alleged violations occurring in this case deal with the trading of commodity futures, plaintiff has failed to state a cause of action under Section 10 of the Act.

## C. CAUSE OF ACTION UNDER THE COMMODITIES EXCHANGE ACT AND STATE CLAIMS

■ By supplemental complaint, plaintiff alleges that defendants' actions violated the provisions of the Commodities Exchange Act. (7 C.F.R. § 6b). However, inasmuch as there is no implied private right of action under the CEA after the 1974 amendments, plaintiff's suit must be dismissed. *Rivers v. Rosenthal & Co.*, 634 F.2d 774, 792 (5th Cir. 1980).

■ Plaintiff's pendent claims based upon Louisiana law must be dismissed for lack of subject matter jurisdiction, there being no federal claims remaining and no diversity of citizenship between the parties.

## III. CONCLUSION

While we decline to grant defendants' motion for summary judgment on grounds that no security exists in this case, we hold that plaintiff has failed to state a claim cognizable under Section 10 of the Exchange Act. Further, we hold that plaintiff has no implied right of action under the Commodity Exchange Act. Therefore, plaintiff's suit should be and hereby is DISMISSED.