Jim LONG, et al., Plaintiffs–Appellants,

v.

SHULTZ CATTLE COMPANY, INCORPORATED, an Oklahoma Corporation, and William B. Shultz, Defendants–Appellees.

No. 88–1169.

United States Court of Appeals,
Fifth Circuit.

Feb. 28, 1990.

Michael G. O'Neill, Lisa M. Williams, Hamilton & O'Neill, Dallas, Tex., for plaintiffs-appellants.

John D. Luken, Paul R. Mattingly, Cincinnati, Ohio, for defendants-appellees.

ON PETITION FOR REHEARING AND
SUGGESTION FOR REHEARING
EN BANC

Before KING, WILLIAMS and SMITH, Circuit Judges.

PER CURIAM:

We deny the petition for panel rehearing, but write to express our reasons for doing so.

I.

The sole issue in this appeal was whether the plaintiffs-appellants Jim Long, Jerome

Atchley, and Jon and Linda Coleman (collectively "plaintiffs") were entitled to a directed verdict or a judgment n.o.v. holding that, as a matter of law, certain cattle feeding consulting agreements offered by defendants-appellees William Shultz and Shultz Cattle Company, Inc. (collectively "SCCI") constituted investment contracts, and thus securities, under the Securities Act of 1933 and the Securities Exchange Act of 1934 (the "Securities Acts"). In a unanimous panel opinion, we reversed the judgment of the district court, which was entered in favor of SCCI based on a jury finding that the agreements were not investment contracts. We held that the evidence presented at trial was so overwhelmingly in favor of the plaintiffs that no reasonable jury could have arrived at this verdict.

In determining that SCCI's consulting agreements were securities, the panel applied the seminal test for an investment contract set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Our analysis of the second prong, or "common enterprise" element, of the *Howey* test relied, in part, on principles developed in *SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974), a case in which the Fifth Circuit held that trading in individual discretionary trading accounts fell within the ambit of the term investment contract under the Securities Acts.

SCCI now requests an en banc rehearing to allow the Fifth Circuit to reconsider *Continental Commodities* and its approach to the "common enterprise" component of the *Howey* test for an investment contract. SCCI characterizes our circuit's approach as a broad form of "vertical commonality" that "effectively eliminates entirely the second prong of the Supreme Court's three-part *Howey* test."

The Fifth Circuit's approach to determining the existence of a common enterprise is at odds with the stricter approaches taken in other circuits that have addressed the common enterprise issue.[1] We recognized in our panel opinion that under the commonality theory adopted in *Continental Commodities*, "the second and third prongs of the *Howey* test may in some cases overlap to a significant degree and ... our standard has been criticized for that reason." 881 F.2d at 141. In our view, however, this case is not the appropriate vehicle by which to reconsider the path we chose in *Continental Commodities*.

## II.

Criticisms aimed at *Continental Commodities* inevitably revolve around the

---

1. Although the Supreme Court has not held profit/loss pooling to be a requirement for an investment contract, several circuit courts have adopted this approach in analyzing whether a common enterprise exists. The Third, Sixth, and Seventh Circuits have developed a pure horizontal commonality requirement, under which the investors' funds must be pooled or the investors' fortunes must rise or fall together in order to create a common enterprise. *See Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 682 F.2d 459, 460 (3d Cir.1982); *Hart v. Pulte Homes of Mich. Corp.*, 735 F.2d 1001, 1004 (6th Cir.1984); *Hirk v. Agri–Research Council, Inc.*, 561 F.2d 96, 100–01 (7th Cir.1977). The Ninth Circuit has adopted a more liberal approach that encompasses both horizontal and vertical commonality. A common enterprise will be present if investors' interests or profits are pooled, or if no such pooling exists, if there is a direct correlation between the success of the promoter and that of the investor. *See Hocking v. Dubois*, 885 F.2d 1449, 1455, 1459 (9th Cir. 1989) (en banc).

In *Continental Commodities*, the Fifth Circuit embraced what it termed a "resilient standard" under which "the critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." 497 F.2d at 522. Continental Commodities served as an investment adviser to individual investors regarding options on commodities futures. The broker did not share in its investors' profits or losses (no vertical commonality, as that term is applied in the Ninth Circuit), and investors' funds were not pooled so that profits were distributed pro rata (no horizontal profit pooling). Nonetheless, we decided that "the success of the trading enterprise as a whole and customer investments individually is contingent upon the sagacious investment counseling of Continental Commodities," and thus seemed to hold that a particularly strong showing of the third prong of the *Howey* test could compensate for a weak showing of the second prong. *Id.* at 522–23.

wisdom of applying the full weight of federal securities laws to situations, such as the typical trading account cases, that involve stand-alone transactions between an adviser and an investor for a flat commission—a factual context in which circuit courts disagree as to whether the common enterprise element of the *Howey* test is satisfied. The economics and federal securities law policies of *Continental Commodities* are simply not present in the case at bar.

In its suggestion for rehearing, SCCI attempts to distinguish the facts of this case from a typical *Howey* common enterprise by characterizing its consulting agreements as individual service contracts for the rendering of professional advice to sophisticated, actively involved investors for an upfront flat fee. Although the relationship between the plaintiffs and SCCI certainly included the rendition of professional investment advice for a flat fee,[2] the investment package offered by SCCI was far more encompassing, involving hundreds of investors in a cattle raising operation that SCCI actively supervised, pooling of assets to purchase the cattle (resulting in the ownership by each investor of an undivided interest in the cattle poundage in one or more pens), and sharing among investors of the risks of cattle loss and of various feeding expenses. Moreover, as we concluded in the panel opinion, "[d]espite the formal representations [in the consulting agreements] that investors would actively manage their own cattle-feeding businesses, the evidence was undisputed that in reality, SCCI's clients did not have the wherewithal to manage a cattle-feeding business and relied instead on SCCI to make all essential managerial decisions."[3] 881 F.2d at 139.

Focusing on the economic realities underlying SCCI's investment scheme, rather than on the legal jargon SCCI used to clothe the deal, the common enterprise in this case is closely analogous to the one found by the Supreme Court in *Howey.* Like *Howey,* investors here were business and professional people who resided in locales far removed from their nominally owned cattle, and who possessed neither the knowledge nor the desire to buy, raise, and market cattle on an individual basis. SCCI investors were attracted by the "10 to 1 write off potential" of their investment and looked to SCCI's touted experience in the cattle business and commodity market to manage their cattle purchases. Only a large-scale cattle feeding operation could provide SCCI with the shopping list of variables—the geographic location and proven economic efficiency of feedlots, the amount, type and price of feed, and the age, size, price, and projected slaughter-readiness dates for cattle—necessary for realization of its advertised investment scheme, which centered on accurate tax deferral of income and adequate control over the risk of loss critical to effective hedging.

In the conventional commodity futures trading case, an individual investor's expectations as to the profitability of his discretionary trading account may well be unaffected by the scale of the brokerage operation or, indeed, by whether there are any other investors at all. By contrast, the economics of a broadly marketed, large-scale cattle feeding operation, in which investors' expectations of profitability are dependent upon the managerial and cattle raising expertise of others and on the economies of scale offered by the underlying

---

**2.** Investors paid SCCI $20 per head of cattle as a "consulting fee." We do not find persuasive SCCI's argument, however, that this fact is dispositive. *Howey* requires that we view the deal from the perspective of the investor and that which he has been led to expect at the time of the offer, not from the perspective of the promoter and the form his compensation assumes. We note that in *Howey,* the promoters' financial interest in the investors' orange groves also consisted of a specified fee plus the cost of labor and materials. 328 U.S. at 296, 66 S.Ct. at

1101–02. Although the *Howey* promoters participated in the earnings generated by the orange growing enterprise through the ownership of adjoining acreage, this factor was not emphasized by the Court in its analysis.

**3.** SCCI requests rehearing based also on the panel's holding that the third prong of the *Howey* test, the "efforts of others" element, was satisfied as a matter of law. This issue was adequately addressed in our panel opinion.

cattle feeding venture, are fundamental *Howey* economics.

We recognize the importance of a workable definition of the term "investment contract," one that fully implements the remedial purposes of the Securities Acts without unduly burdening commercial enterprises that Congress never intended to be covered under the federal securities laws. The instant case, however, does not lie in that shadowy region of investment contracts where—until Congress or the Supreme Court acts to further define the term—circuit court guidance is needed to refine the *Howey* test. On the contrary, because the investment schemes SCCI offered to its investors were quintessential *Howey* security transactions, the common enterprise gloss that circuit courts, including our own, have placed on the *Howey* test cannot affect the conclusion that SCCI's consulting agreements were subject to the federal securities laws. Under *any* circuit's definition of common enterprise, the result in this case would remain unchanged. Thus, any attempt to use the facts of this case to overhaul our circuit's definition of common enterprise would only further confound an already perplexing and controversial area of securities law.

■ Because we are not compelled by this case to reevaluate *Continental Commodities*, we refrain from doing so. In a factual context more analogous to that of *Continental Commodities*, and subject to the requirements of our *en banc* procedure, we would consider taking a fresh look at the policy issues raised in that case.

### III.

No member of the panel nor Judge in regular active service of this Court having requested that the Court be polled on rehearing en banc (Federal Rules of Appellate Procedure and Local Rule 35), the Suggestion for Rehearing En Banc is DENIED.