James E. WHITE, Plaintiff–Appellee,

v.

Leon TAYLOR, etc., et al., Defendants,

Clell Harrell, Defendant–Appellant.

No. 90–7100.

United States Court of Appeals,
Fifth Circuit.

April 29, 1992.

---

Gary E. Friedman, W. Thomas Siler, Jr., Phelps Dunbar, Jackson, Miss., for defendant-appellant.

Brad Sessums, Richard D. Underwood, Young, Scanlon & Sessums, Jackson, Miss., for plaintiff-appellee.

Before POLITZ, Chief Judge, SMITH, Circuit Judge, and FITZWATER,* District Judge.

FITZWATER, District Judge:

In this appeal from a judgment holding a chief of police individually liable, we decide whether the contours of the Fourth Amendment right of a warrantless misdemeanor arrestee to a prompt probable cause determination were clearly established prior to *County of Riverside v. McLaughlin,* —— U.S. ——, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Concluding they were not in the sense relevant to the instant facts, and that there is no other basis to find that the police chief violated clearly established law, we reverse the judgment on the ground that the police chief is entitled to qualified immunity.

I

Plaintiff-appellee James E. White ("White") sued defendant Leon Taylor ("Taylor"), a City of Morton, Mississippi police officer, defendant-appellant Clell Harrell ("Harrell"), the Morton Chief of Police, and the City of Morton in connection with his arrest and detention on May 29, 1987. He contended his Fourth Amendment rights were violated when he was arrested without probable cause and was detained in the City of Morton jail for an unreasonable period of time without a probable cause determination by a neutral magistrate. He sought relief for the alleged federal constitutional violations pursuant to 42 U.S.C. § 1983 and also sued on the basis of Mississippi common law. White sued Officer Taylor and Chief Harrell in both their individual and official capacities.

█ Defendants moved to dismiss plaintiff's amended complaint. In pertinent part, Chief Harrell contended he was entitled to qualified immunity from individual

* District Judge of the Northern District of Texas, sitting by designation.

liability. The district court denied the motion, *see White v. Taylor*, 677 F.Supp. 882, 888 (S.D.Miss.1988), and a panel of this court affirmed the order in an unpublished opinion. *See White v. Taylor*, 877 F.2d 971 (5th Cir.1989) (per curiam) (table).[1] Following discovery, Chief Harrell moved for summary judgment, contending in pertinent part that he was entitled to qualified immunity from individual liability on White's unreasonable detention claim. The district court denied this ground of the motion, holding it was a jury question "whether the eight-hour, overnight detention of the Plaintiff was reasonable." *White v. Taylor*, 775 F.Supp. 962, 965 (S.D.Miss.1990).

Thereafter, the parties tried the case to a jury. The verdict was favorable to the defendants on all the plaintiff's claims except the Fourth Amendment unreasonable detention claim against Chief Harrell individually. As to that cause of action the jury found Chief Harrell's decision to detain White in the Morton jail was "an intentional act which caused or contributed to cause a violation" of White's constitutional rights. The jury awarded White $1.00 in nominal damages, no actual damages, and $25,000 against Chief Harrell in punitive damages. The district court entered judgment on the verdict. *See id.* at 969 (reprinting judgment). The balance of White's claims, including all claims against codefendants Taylor and the City of Morton, were dismissed with prejudice. Chief Harrell now appeals the judgment holding him individually liable.

**1.** The panel's affirmance was limited to the sufficiency of the amended complaint to withstand a motion to dismiss. The amended complaint did not, however, expressly state an unreasonable detention claim against Chief Harrell individually. Indeed, we do not find that White alleged such a theory against Chief Harrell in either the original or amended complaint, although the pretrial order does contain the claim. We do not, therefore, view ourselves as precluded by the prior panel's affirmance from holding that Chief Harrell is entitled to qualified immunity as a matter of law based on the evidence adduced at trial.

**2.** White's view of what occurred is substantially different, although his testimony corroborates parts of Officer Taylor's version. According to

We recount the evidence favorably to the verdict because we are asked, in pertinent part, to reverse the district court's failure to direct a verdict in favor of defendant-appellant. The jury found that Officer Taylor had probable cause to arrest White but that White was unreasonably detained. We therefore summarize the evidence surrounding the arrest in a manner favorable to the arresting officer and recount favorably to White the facts of his detention and of Officer Taylor's lack of authority to make an arrest.

White was driving home from work in his pickup truck on Friday night, May 29, 1987, when he was stopped by two City of Morton police officers at approximately 10:45 p.m. White had been a Morton resident for several years. He retired from the Jackson, Mississippi police department after 23 years, and then began working full time in a security job with a beverage company in Jackson. White reported to work on May 29 at 2:00 p.m. and left the company premises at around 9:45 p.m. After making the night bank deposit, he drove toward Morton.

Officers Taylor and Keith Hollingshead ("Hollingshead") were patroling Morton and its environs at the time. Officer Taylor was driving the squad car westbound on Highway 80 when he observed White's truck traveling eastbound. White's vehicle swerved partially into the westbound lane, passing the officers and forcing them off the road.[2] Officer Taylor spun his vehicle

White, when he reached the intersection of Highways 13 and 80 located west of Morton, he drove over a portion of the road in which the blacktop surface had dropped down from the concrete, causing his truck to weave. White then traveled eastbound on Highway 80. Officers Taylor and Hollingshead were traveling westbound. According to White, his truck never crossed the center line of the highway. Nevertheless, Officers Taylor and Hollingshead reversed direction, illuminated their lights, and pulled White over.

Based on his police training, White put his hands in plain sight on the truck's steering wheel. Officer Taylor, who was driving, approached White's vehicle while Officer Hollingshead remained at the rear. Officer Taylor informed White he had weaved on the road and

around and pursued White's truck. He assumed the driver had been drinking. When the officers pulled up behind White they illuminated their blue lights. White veered across the center line, straddled it, and returned to his lane. Officer Taylor thought White would hit someone. Believing White had not seen the blue lights, Officer Taylor bumped his yelper. White then pulled over.

Officer Taylor called in a license registration to the dispatcher before exiting his vehicle. Both officers then approached White's truck. Officer Taylor asked White if there was a problem, to which White replied that any problem was with Officer Taylor. The officer asked White if he had been drinking and informed him he had seen White weaving on the road and that he did not stop in response to the blue lights. White replied that he did not drink and offered to take a breathalyzer test. Officer Taylor asked White for his driver's license, to which White responded, "The only thing you're going to get out of me is a lot of trouble." Officer Taylor then asked White to step out of his truck.

White popped or shoved the driver's side door hard enough to knock Officer Taylor back several feet. The officer caught the door before it hit him, but he was still pushed several feet backwards. When White exited the truck he began pointing his finger at Officer Taylor, telling him he did not have enough sense to know what he was doing and that he expected this from the Morton police. He asked the officers if they could not find better things to do than to harass people on the streets and motorists. As White spoke, he raved and waved his arms around. He appeared angry and offended, speaking two or three minutes without interruption.

Officer Taylor then told White "I've heard enough of that" and ordered him into the squad car. When White continued on, the officer repeated the instruction. Officer Hollingshead intervened, telling White to get inside the car. White then complied.

Officer Taylor looked inside the truck, locked it, and started to the police station with the intent to find out what was wrong with White and to book or charge him. He changed his mind on the way there, however, because White kept beating on the cage that separated the front and back seats in the police vehicle, and making threats and insulting remarks. White accused the officer of not knowing what he was doing and threatened to sue Officer Taylor and the City of Morton. By that point Officer Taylor had become mad. He decided that if he took White to the police station, with both of them mad, there would be a fight, someone would get hurt, and White would still end up in jail. He therefore chose to take White straight to jail.

When White arrived at the jail he requested permission to make a telephone call so that he could contact his wife and lawyer. The officers did not respond to the request. White was neither booked nor informed of the charges against him.

After Officer Taylor placed White in the jail, he returned to the police station. He ran a full registration on White's truck. When the information came back, he called Chief Harrell.[3] The time was approximate-

asked what White had been drinking. White responded that he did not drink. When Officer Taylor challenged this statement, White replied in a loud voice that the officers should take him to the police department and give him a breath test. Officer Taylor then jerked open the door of White's truck, saying "12 hours in the cooler will cool you off." Officer Taylor ordered him into the squad car. White challenged this action, informing the officer he had not done anything, and asking him if he knew what he was doing and knew his job. He also told Officer Taylor he had been in law enforcement for 23 years. As White got in the vehicle, Officer Hollingshead instructed him to "be quiet." The officers did not ask White for his driver's

license or inform him of the charges. After White entered the squad car, Officer Taylor searched the truck and ran a license plate check.

The officers took White straight to the Morton jail. During the six to seven minute ride, White did not get angry. He did ask the arresting officers whether they really could put him in jail when he had done nothing. The officers did not respond to this question.

3. We recognize our obligation to view the facts and inferences concerning White's detention claim favorably to the verdict. We have done so below in summarizing the events that transpired at the jail after White arrived there in the

ly 11:00 p.m. Chief Harrell was at home asleep. Officer Taylor explained to the Chief what had happened during the stop and arrest and why he had transported White directly to the jail. He informed Chief Harrell that he thought White would get hurt. The Chief instructed Officer Taylor to lock the arrestee up and he would talk to him in the morning. Officer Taylor complied with this directive.

Chief Harrell based his decision on Officer Taylor's statement that White was very disorderly and the fact that he had telephoned the Chief at home. He felt if the arrestee's conduct was such that Officers Taylor and Hollingshead were required to lock up the arrestee and to call him at home, "it would have to be very disorderly."

Chief Harrell did not instruct Officer Taylor to take White before a magistrate. Morton was a city of approximately 3,000 people at the time of trial. It had one municipal judge, who did not hold court at night.

White remained in the Morton jail until 6:00 a.m. the next morning. At that time his first cousin, Captain Leslie Huff ("Huff"), a Morton police officer, came on duty. The dispatcher informed Captain Huff when he arrived at work that White was being detained. Captain Huff determined that White had been charged with the misdemeanor offense of disorderly conduct, and took White to the police department for release on his written promise to appear in court. By White's calculation, he had been detained a little over six hours.

White was charged sometime during the night with disorderly conduct. On June 18, 1987—the day of his trial—Officers Taylor and Hollingshead alleged in an affidavit that White was guilty of reckless driving. White was acquitted of the charges by the City of Morton Municipal Court because Officer Taylor was not a certified police officer and thus lacked the authority to arrest White. *See* 775 F.Supp. at 964.

Officer Taylor had not been certified by the state as a law enforcement officer prior to May 29, 1987 because he could not obtain certification without a high school or general equivalency diploma. Officer Taylor completed only the ninth grade. He had performed shore patrol duty in the Navy and had been employed as a patrolman by another Mississippi city police department for four years, during which he received on-the-job training. He did not obtain a GED equivalent, however, until February 1987.

Officer Taylor commenced employment with the City of Morton in October 1985. Following a probationary period, he became a permanent officer. He was given neither written nor classroom training. In October 1986 the City sent Officer Taylor to the police academy in Laurel to obtain his certification. It was there that Officer Taylor found he was not eligible for certification because he lacked a high school diploma or GED. The police academy then sent him home.

Officer Taylor was not removed from the Morton police force, however. Although common sense told Officer Taylor he lacked authority to make arrests, neither Chief Harrell nor the Morton Mayor informed him of this. Chief Harrell knew it was required that Officer Taylor be certified within one year of being employed; otherwise, he lacked authority to exercise the powers of the office. The Chief was not aware of the deficiency in Officer Taylor's educational background when he hired him. He knew following Officer Taylor's return from the academy that the officer was not authorized to make arrests. He kept him on, although he knew it was wrong to do so, because Officer Taylor was a good officer and his experience made him better qualified than a lot of officers, and because the Chief intended for him to com-

custody of the officers. There is no direct evidence, however, to counter Officer Taylor's and Chief Harrell's testimony concerning the content of their conversation. Nor does White appear to suggest there is circumstantial evidence that calls into question their versions of what

the two said to each other. Instead, the focus of White's challenge is the reasonableness of Chief Harrell's decision to detain him. We therefore assume to be true the trial testimony of Officer Taylor and Chief Harrell concerning the content of their telephone conversation.

plete his GED and obtain certification. Chief Harrell did not want to lose a good officer and felt it would be difficult for a small city to replace him.

Chief Harrell told Officer Taylor he must accompany a certified officer whenever he was on patrol. Since all other full-time officers were certified, Officer Taylor could work with any other officer on any shift. The Chief always assigned him to patrol with full-time officers. Officer Taylor was not to sign affidavits unless another officer signed as well or to make an arrest unaccompanied by a certified officer. But he nevertheless did so—in violation of his instructions—on at least 29 occasions between the date he was returned from the academy and the night of White's arrest. And on that night, Officer Taylor considered himself to be more senior to Officer Hollingshead and to be participating in Officer Hollingshead's training.

## II

Chief Harrell challenges the judgment against him on several grounds. We need only reach the contention that the district court erred in denying his motion for directed verdict based upon qualified immunity.

### A

The jurisprudence of the qualified immunity doctrine is familiar. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The doctrine of qualified immunity shields a police officer from liability for civil damages when a reasonable officer could have believed that the challenged conduct did not violate clearly established statutory or constitutional rights." *Husband v. Bryan*, 946 F.2d 27, 30 (5th Cir. 1991) (quoting *Simpson v. Hines*, 903 F.2d 400, 402 (5th Cir.1990)); *see Streetman v. Jordan*, 918 F.2d 555, 556 (5th Cir.1990). Qualified immunity is available to state of-

ficials sued for constitutional violations pursuant to 42 U.S.C. § 1983. *See Harlow*, 457 U.S. at 818 n. 30, 102 S.Ct. at 2738 n. 30 (citing *Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978)).

Whether a government official is entitled to qualified immunity "generally turns on the 'objective reasonableness of the action' assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Texas Faculty Ass'n v. University of Texas at Dallas*, 946 F.2d 379, 389 (5th Cir.1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). The law is deemed to be clearly established if the contours of a right asserted are sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* at 389–90. The standard is formulated at this level of generality in order to afford the measure of protection that the doctrine is intended to confer. *See Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3039. Therefore, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence, more relevant sense." *Id.* at 640, 107 S.Ct. at 3039. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Id.* If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity. *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir.1990). Whether the conduct of which the plaintiff complains violated clearly established law is an essentially legal question. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Pfannstiel*, 918 F.2d at 1183.

### B

We review the district court's decision not to direct a verdict by the same standard that applies when we review the denial of a motion for judgment notwithstanding the verdict. *Horton v. Buhrke, A*

*Div. of Klein Tools, Inc.*, 926 F.2d 456, 459 (5th Cir.1991). We examine the record in the light most favorable to the party opposing the motion. *Id.* "Reversal of the district court's judgment is proper only if this Court finds that there was no conflict in substantial evidence such that reasonable minds could differ." *Id.* If the moving party is entitled to judgment as a matter of law, however, the district court errs by refusing to enter a directed verdict. *See Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 132 (5th Cir.1989) (stating standard applicable to judgment n.o.v.), *reh'g denied*, 896 F.2d 85 (1990).

 We determine Chief Harrell's entitlement to qualified immunity by deciding whether the contours of the right in question were clearly established.[4] On May 29, 1987 the law concerning the Fourth Amendment right of a warrantless arrestee to a prompt determination of probable cause by a neutral and detached magistrate was derived from *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In *Gerstein* the Supreme Court decided whether a person arrested and held for trial under a prosecutor's information is constitutionally entitled to a judicial determination of probable cause for pretrial restraint of liberty. *Id.* at 105, 111, 95 S.Ct. at 858, 861. The Court held "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 114, 95 S.Ct. at 863. The Court stopped short of prescribing a specific procedure to be followed in determining

probable cause, leaving to the states the flexibility to experiment. *Id.* at 123, 95 S.Ct. at 868. But it held specifically that

> Whatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest.

*Id.* at 124–25, 95 S.Ct. at 868–69 (footnotes omitted).

Because it is the Fourth Amendment right to a probable cause determination "promptly after arrest" on which Chief Harrell's individual liability to White is predicated, we must determine whether the contours of this right were clearly established. We find the answer to our inquiry in a Supreme Court opinion handed down after the trial of this case and which was therefore unavailable to guide the district court.

In *County of Riverside v. McLaughlin* the Supreme Court granted certiorari to "define what is 'prompt' under *Gerstein*." —— U.S. at ——, 111 S.Ct. at 1665. The *McLaughlin* respondent brought a systemic challenge to a county policy of combining probable cause determinations with arraignment procedures. According to the policy, arraignments were to be conducted without unnecessary delay and, in any event, within two days of arrest. Because the requirement excluded weekends and holidays from the two day computation, a warrantless arrestee could be held for as

---

**4.** We recognize that in a *Mitchell v. Forsyth* appeal there is an analytical step that precedes the inquiry whether a constitutional right is clearly established. That is the determination whether the plaintiff has asserted a violation of a constitutional right at all. *See Siegert v. Gilley,* —— U.S. ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). We have interpreted *Siegert* to require that we examine whether the plaintiff has stated a claim for a constitutional violation before reaching the issue of qualified immunity. *See Quives v. Campbell,* 934 F.2d 668, 670–71 (5th Cir.1991) (holding on the basis of *Siegert* that summary judgment should be affirmed because plaintiff failed to state a constitutional claim rather than because defendant was entitled to qualified immunity); *Samaad v. City of Dallas,* 940 F.2d 925, 942 (5th Cir.1991)

(citing *Siegert* and reversing summary judgment that denied defense of qualified immunity where plaintiffs failed to state a constitutional violation); *Duckett v. City of Cedar Park, Tex.,* 950 F.2d 272, 278 (5th Cir.1992) (on the basis of *Siegert, Quives,* and *Samaad,* holding appellate court should review denial of motion for summary judgment by first resolving whether plaintiff stated claim for violation of right secured under the United States Constitution).

This is not an interlocutory *Mitchell v. Forsyth* appeal, however, and Chief Harrell does not argue before us that White failed to assert a violation of a constitutional right. We therefore proceed to consider whether the contours of the constitutional right asserted by White were clearly established on May 29, 1987.

long as five days (or even seven days over Thanksgiving) without the benefit of a probable cause determination. *Id.* The Court forged a bright line rule in the case of systemic challenges, holding "that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein.*" *Id.* —— U.S. at ——, 111 S.Ct. at 1670. As to individual challenges, a person can prove a Fourth Amendment promptness violation—even within the 48 hour window—if the determination is unreasonably delayed. *Id.* The Court specified as examples of such violations, delay incurred for the purpose of gathering additional evidence to justify the arrest, delay motivated by ill will against the arrested individual, or delay for delay's sake. *Id.*

The portions of *McLaughlin* pertinent to our inquiry are found in the Court's description of the state of the unreasonable detention jurisprudence following *Gerstein* and prior to *McLaughlin.* The Court noted that *Gerstein* "stopped short of holding that jurisdictions were constitutionally compelled to provide a probable cause hearing immediately upon taking a suspect into custody and completing booking procedures." *Id.* —— U.S. at ——, 111 S.Ct. at 1668; *see id.* at ——, 111 S.Ct. at 1669 ("*Gerstein* held that probable cause determinations must be prompt—not immediate"). The Court instead "left it to the individual States to integrate prompt probable cause determinations into their differing systems of pretrial procedures." *Id.* at ——, 111 S.Ct. at 1668. But the Court observed:

> Unfortunately, as lower court decisions applying *Gerstein* have demonstrated, it is not enough to say that probable cause determinations must be "prompt." *This*

*vague standard simply has not provided sufficient guidance.*

*Id.* at ——, 111 S.Ct. at 1669 (emphasis added). The Court therefore defined as its task in *McLaughlin* "to articulate more clearly the boundaries of what is permissible under the Fourth Amendment." *Id.* at ——, 111 S.Ct. at 1670.

We can find no stronger footing for the conclusion that the contours of a constitutional right were not clearly established than the Supreme Court's finding that its own standard "simply has not provided sufficient guidance." *See id.* at ——, 111 S.Ct. at 1669. Therefore, while we think the law was clearly established on May 29, 1987 that a warrantless misdemeanor arrestee had a right to a prompt determination of probable cause,[5] we hold the contours of that right were not sufficiently clear so that a reasonable law enforcement officer would have known that such a person, arrested late at night in a city without a night magistrate, could not be held overnight before taking the arrestee before a magistrate. *See Gonzalez v. Tilmer,* 775 F.Supp. 256, 265 (N.D.Ill.1991) ("If *Gerstein* was too vague to give sufficient guidance to the courts, a police officer acting in 1984 could hardly be expected to fathom its fine constitutional nuances").[6] Chief Harrell was therefore entitled to qualified immunity from individual liability. The district court—who, unlike us, lacked the guidance of *McLaughlin*—erred by failing to direct a verdict in the Chief's favor.

### C

■ We recognize that *McLaughlin* does not eliminate all claims based on detentions of less than 48 hours duration.

---

5. That the right can be identified at this "level of generality" is not sufficient to make it clearly established at the level necessary to deprive Chief Harrell of qualified immunity. *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3039.

6. Since *McLaughlin* the majority of courts that have considered detentions of less than 48 hours have held the conduct did not violate the Constitution. *See, e.g., Roundtree v. City of New York,* 778 F.Supp. 614, 620–21 (E.D.N.Y.1991) (24 hours); *Arnold v. City of Chicago,* 776 F.Supp.

1259, 1265 (N.D.Ill.1991) (34 hours); *Hickombottom v. McGuire,* 765 F.Supp. 950, 953 (N.D.Ill.1991) (11 hours).

Moreover, in noting that courts cannot ignore the often unavoidable delays resulting from "handling late-night bookings where no magistrate is readily available ... and other practical realities," *McLaughlin,* —— U.S. at ——, 111 S.Ct. at 1670, the Court suggested that conduct such as Chief Harrell's did not violate the Fourth Amendment.

*McLaughlin* itself sets out instances in which such delays, while generally immune from systemic challenge, can nevertheless violate the Fourth Amendment. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." —— U.S. at ——, 111 S.Ct. at 1670. "[D]etention for one of the improper purposes cited in *McLaughlin* ... clearly [is] unreasonable even under *Gerstein.*" *Gonzalez,* 775 F.Supp. at 265; *cf. Austin v. Hamilton,* 945 F.2d 1155, 1162 (10th Cir.1991) (detainees' allegations of an unreasonably prolonged 12 hour episode of unnecessary physical violence and inhumane treatment "invoke settled [pre-*McLaughlin* ] fourth amendment principles"). But while we do not foreclose actions based on such theories, the instant case was neither submitted to the jury on such a basis nor would the evidence have supported a finding that Chief Harrell ordered White detained for an unlawful purpose.

The district court instructed the jury that White asserted he was deprived of constitutional rights "by being unreasonably confined in jail for a longer time than was reasonable under the circumstances" and that White claimed "he was detained or incarcerated in the Morton City Jail for an unreasonable length of time." The district judge told the jury that it could find for White on this claim if he had proved a detention or incarceration "for an unreasonable length of time." Although the jury was to consider "the circumstances then existing," the jury was not specifically instructed that it could base its verdict upon non-temporal factors. The case was tried on the basis of the reasonableness of the length of, not the allegedly unlawful reasons for, White's detention.

Nor do we think the evidence would have supported a verdict against Chief Harrell for detaining White for an improper purpose. We therefore respectfully disagree with the dissent's view of the evidence, which we think unjustifiably blends Officer Taylor's conduct with the actions of appellant Harrell.

It must be remembered that the verdict against Chief Harrell stands, if at all, upon the jury's findings that the length of White's detention was not reasonable and that Chief Harrell's decision to detain White was "an intentional act which caused or contributed to cause a violation of the plaintiff's constitutional rights." The jury absolved the defendants of liability based on Officer Taylor's conduct. Yet the dissent implies that a statement made by Officer Taylor ("I told [White] it was his mouth that got him in [jail]") is indicative that Chief Harrell harbored an illegal purpose in ordering White's detention. *See infra* at 550. The dissent also suggests that the Chief "craft[ed] impromptu rules for individuals who merely 'mouth off.'" *See infra* at 550. By our light, neither view is supported by the record.

The direct evidence concerning why the Chief ordered White's detention came from two sources: Officer Taylor and Chief Harrell. Officer Taylor testified that when he placed White in the squad car, White kept beating on the cage between the back and front seats, and made threats and insulting remarks.[7] He felt both he and White were mad and that a fight could ensue at the police station, with someone getting hurt. Officer Taylor decided to take White "right on to jail right then." The officers transported White to the jail and returned to the station. Officer Taylor ran a full registration on the vehicle and then called Chief Harrell at approximately 11:00 p.m., telling him what had occurred. In pertinent part, he testified as follows:

> I called [Chief Harrell] and explained to him that I had a man out there on the road, what he had done, that he refused to give me his driver's license, he didn't cooperate, and he tried to knock me down with the door and insulting the police department and going to sue everybody

---

7. We recognize that White disputes this evidence. But what is pertinent for our inquiry is what Officer Taylor told Chief Harrell, since this is the information on which he based his decision to detain White.

and I said locked him up. I didn't give him a phone call, I didn't—I carried the man to jail to keep from having serious trouble at the police station because it had done got to that point that it would have been. Somebody would have got hurt. And I don't think it would have been me. Mr. Harrell, Chief Harrell, advised me, lock him up.... "I want to talk to the man in the morning."

Chief Harrell testified to his recollection of the conversation with Officer Taylor, stating in pertinent part:

So Mr. Taylor had called me and said he had a person that was very disorderly; and I know for him to call, he and [Officer] Hollingshead to call, it would have to be very disorderly. And I told him to leave him there and I would talk to him in the morning.

While the Chief evidenced a clear disinclination to "jump up and run" to the police station in the middle of the night in response to every telephone call he received, he testified that "somebody would have to be very disorderly for Taylor and Mr. Hollingshead to lock them up" and that it was not the procedure to book someone at the police station before taking them to jail if "that person is violent or where he may— one or the other may get hurt." We conclude there is no direct evidence that Chief Harrell based his decision to detain White on anything less than his belief that White was a very disorderly arrestee and that holding him until the morning was appropriate. Nor can the proof reasonably be understood to reflect that Chief Harrell crafted an "impromptu" rule to be applied only in White's case.

We also think it necessary to address the assertion in the dissenting opinion that Chief Harrell "admitted that he gave [the detention] order knowing that only misdemeanor charges against White were possible and that the detention was therefore illegal as a matter of state law." *See infra*

at 550. We have found no such admission in our reading of the record.

Chief Harrell was asked at trial about his knowledge of Mississippi Code Ann. §§ 99–3–17 and 99–3–18. He stated he was not familiar with these provisions according to their sections or code numbers, but was aware of their content. He did not admit the detention was illegal as a matter of state law. Chief Harrell acknowledged that disorderly conduct, which was the conduct attributed to White, was a misdemeanor. He testified that misdemeanor arrestees were not normally detained but were held if they were drunk or if the type of charge or person involved so warranted. But this concession did not make the detention "illegal as a matter of state law" because §§ 99–3–18 and 99–3–17 do not preclude a misdemeanor arrestee from being detained.

Our review of the trial evidence does not permit us to join the dissent's conclusion that the jury "obviously" found that Chief Harrell's order to detain White "was motivated by ill will." [8] *See infra* at 550. The evidence adduced at trial showed that White and Chief Harrell were not personally acquainted. Chief Harrell testified he did not know who White was prior to the night of the arrest. White did not dispute this. White testified he had met the Chief at church and other places and that the Chief always spoke to him. But he also acknowledged the Chief might not have known his name. Chief Harrell admitted he could have attended church with White, but did not know that he had and did not recall knowing White. There is no evidence in the record to support a finding of personal animus on the Chief's part.

Nor do we think the evidence establishes that Chief Harrell acted with ill will toward White, even if known to him on May 29, 1987 only as a misdemeanor arrestee. White does not dispute that the Chief's knowledge of the events surrounding White's arrest was limited to what Officer

---

**8.** We assume our dissenting colleague infers this from the jury verdict. We think the inference is unwarranted. The jury was not asked to make an express finding of ill will. And while the court's instructions to the jury permitted it to award punitive damages based on acts or omissions that "were the result of a reckless or callous indifference for the constitutional rights of James White," the charge did not address "ill will."

Taylor recounted to him. We fail to see how Chief Harrell's response to what he was told can fairly be described as animated by ill will.

We also find ourselves unable to join the dissent's conclusion that "[t]he jury found against Chief Harrell based on his admission that he was 'wrong' in retaining Taylor on the police force because Taylor did not possess the minimum qualifications for a law enforcement officer mandated by Mississippi law." *See infra* at 549. The jury was not directly asked to decide an issue regarding Officer Taylor's qualifications. That question was apparently subsumed in White's contention that Chief Harrell failed to properly train and supervise the officer. Although the jury found that the Chief did not in fact properly train or supervise Officer Taylor, it expressly rejected the contention that White would not have been arrested or detained unreasonably had Chief Harrell done so. Therefore, the jury did not find against Chief Harrell in the sense pertinent to the issue we now address on appeal.[9]

White's unreasonable detention claim against Chief Harrell did not rest upon an alleged illegal purpose for ordering his detention. The trial record would not have supported such a theory had it been submitted to the jury. Chief Harrell is entitled to qualified immunity from individual liability on the single claim as to which the jury found in White's favor.

\*　\*　\*　\*　\*　\*

Because Chief Harrell is entitled to qualified immunity from individual liability as a matter of law, the judgment against him is

REVERSED.

POLITZ, Chief Judge, dissenting:

I would not reject the jury's verdict. Taylor's training was Chief Harrell's responsibility. It is undisputed that the plaintiff White was not properly processed and was jailed overnight at the instruction of Chief Harrell. He was released when a qualified officer came on duty. The Chief's actions were intentional and illegal under Mississippi law. The jury found against Chief Harrell based on his admission that he was "wrong" in retaining Taylor on the police force because Taylor did not possess the minimum qualifications for a law enforcement officer mandated by Mississippi law. "[G]overnment officials performing *discretionary* functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (emphasis added). The majority opinion grants Chief Harrell the cloak of qualified immunity notwithstanding his knowing and intentional violations of the nondiscretionary state laws designed, in part, to protect the constitutional rights of members of the public.

The majority acknowledges that the qualified immunity inquiry focuses on May 29, 1987; however, a subsequent decision, *County of Riverside v. McLaughlin*, —— U.S. ——, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), is used to contradict a prior decision by this court in this very case.[1] In a prior panel opinion, we affirmed the district court's refusal to dismiss this case on qualified immunity grounds. *White v. Taylor*, No. 88–4064 (5th Cir. June 15, 1989) 877 F.2d 971 (unpublished opinion). Accepting as true the facts alleged in White's complaint, we found:

> There is no question that the Fourth Amendment rights Taylor allegedly vio-

**9.** We also think the dissent's conclusion that "[t]he jury found against Chief Harrell based on his failure to supervise Taylor," *see infra* at 550, is overbroad. The jury did find a failure to supervise, but did not find that this resulted in a constitutional violation.

**1.** The majority avoids our prior opinion on the ground that the unreasonable detention claim against Chief Harrell appeared subsequent to the opinion. The prior panel, however, addressed not only Taylor's immunity, but Harrell's as well. *White v. Taylor*, No. 88–4064, pp. 5–6 (5th Cir.1989) [877 F.2d 971 (table) ] (unpublished opinion). The jury found that Chief Harrell was responsible *both* for his failure to supervise Taylor and for his own intentional actions. As I view it, the prior panel's ruling speaks to the issue in this case.

lated were clearly established and recognizable under the circumstances. Only the reasonableness of Taylor's actions in the situation is disputed.... [White's] complaint alleges facts that, although ancillary to the confrontation between White and Taylor, allow the court to make an informed judgment that it cannot hold that Taylor's actions measured up to objectively reasonable, clearly established Fourth Amendment standards. *Id.* at 6–7 [877 F.2d 971 (table)]. The jury found against Chief Harrell based on his failure to supervise Taylor, as well as for the Chief's own participation in the constitutional violation.

At trial White presented evidence to substantiate the factual allegations relied upon by the prior panel.[2] According to Taylor's own testimony, when White asked why he was being placed in jail, Taylor responded, "I told him it was his mouth that got him in there."[3] Taylor testified that it was the Chief's decision to put White in jail for the night. Chief Harrell admitted that he gave this order knowing that only misdemeanor charges against White were possible and that the detention was therefore illegal as a matter of state law. Miss.Code §§ 99–3–17, 99–3–18. Chief Harrell also admitted that he intentionally and knowingly violated state law by employing Taylor. *See* Miss.Code § 45–6–11.

"[T]he Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention." *Gerstein v. Pugh*, 420 U.S. 103, 126, 95 S.Ct.

854, 869, 43 L.Ed.2d 54 (1975). Nowhere in the *Gerstein* analysis, even when viewed through the informing *McLaughlin* prism, is it suggested that local police can, on tangents of their own, intentionally violate state law designed to protect constitutional rights. According to *McLaughlin*, the Court's "purpose in *Gerstein* was to make clear that the Fourth Amendment requires every State to provide prompt determinations of probable cause, but that the Constitution does not impose on the States a rigid procedural framework. Rather, individual States may choose to comply in different ways." *McLaughlin*, 111 S.Ct. at 1668. The only question in *Gerstein* is whether a State's established rules pass constitutional muster.[4] It cannot be taken as authority for the proposition that local police may craft impromptu rules for individuals who merely "mouth off." The *McLaughlin* court recognized as unconstitutional "delay motivated by ill will against the arrested individual, or delay for delay's sake." 111 S.Ct. at 1670. We earlier recognized the distinct possibility that White's detention was motivated by ill will.[5] Based on the trial evidence, the jury obviously so found. I would honor the jury's verdict and therefore I respectfully DISSENT.

**2.** If anything, White presented better evidence than the alleged facts relied upon in the prior opinion. We earlier questioned whether White had been informed of the charges against him: "It is not clear from the complaint or record whether he was formally charged with disorderly conduct, merely told when arrested that he was going to be charged with disorderly conduct, or neither." Unpublished Opinion at 2 [877 F.2d 971 (table)]. The defendants admitted at trial that White was never informed of the charges.

**3.** Taylor testified that he did some paperwork for the charges but that the paperwork was not done in White's presence and was not shown to him. The defendants admitted that White was never informed of any formal charges. Indeed,

Taylor admitted that he had not decided on charges until after White had been locked in the jail cell. White testified that he had no idea what he had done wrong and repeatedly asked why he was being placed in jail.

**4.** The majority opinion quotes *Gonzalez v. Tilmer*, 775 F.Supp. 256 (N.D.Ill.1991), as authority that *Gerstein* was ambiguous. The *Gonzalez* officials, however, followed proper procedures.

**5.** In our prior opinion we observed: "Taylor's failures to follow normal procedures cast doubt on the validity of White's arrest and detention; they may have suggested to the district court that Taylor himself doubted the propriety of the arrest." Unpublished Opinion at 8 [877 F.2d 971 (table)].